# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

TRACY M.,                 :
                                :
           **Plaintiff,**     :       **CIVIL ACTION FILE NO.**
                                  :       **1:17-cv-04713-AJB**
      **v.**                     :
                                  :
**COMMISSIONER OF SOCIAL**    :
**SECURITY ADMINISTRATION,**   :
                                  :
         **Defendant.**[1]     :

## O R D E R   A N D   O P I N I O N

Plaintiff brought this action pursuant to §§ 205(g) and 1631(c) of the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") partially denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").[2]  The parties consented to

---

[1]      Nancy A. Berryhill was the Acting Commissioner of Social Security beginning January 23, 2017.  However, her acting status ended as a matter of law pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*  Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name.  Since Ms. Berryhill no longer is the Acting Commissioner, the Clerk is **DIRECTED** to identify Defendant by the official title rather than by name.

[2]      Title XVI of the Act, 42 U.S.C. § 1381, *et seq.*, provides for SSI for the disabled, whereas Title II of the Social Security Act provides for federal DIB,

magistrate judge jurisdiction. (Dkt. Entry dated 5/25/18). For the reasons set forth below, the Commissioner's decision is **REVERSED AND REMANDED**.

## I.   *PROCEDURAL HISTORY*

On January 30, 2014, Plaintiff filed her application for SSI and DIB alleging a disability onset date of January 26, 2014. [Record (hereinafter "R")16]. These claims were denied initially and upon reconsideration, [R169, 175], and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), [R173]. A hearing was held before an ALJ on August 11, 2016, at which both Plaintiff, who was represented by an attorney, and a vocational expert ("VE"), testified. [R33-96]. On October 18, 2016, the ALJ denied Plaintiff disability benefits prior to December 11, 2015. [R15-27]. Plaintiff then filed for review by the Appeals Council, [*see* R7], which review was

---

42 U.S.C. § 401, *et seq.* The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)). Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI. In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI. However, different statutes and regulations apply to each type of claim. Many times parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations herein should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

2

denied on September 19, 2017, making the ALJ's decision the final decision of the Commissioner. [R1-6]. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (quotation marks and alteration omitted).

Plaintiff filed this action on November 11, 2017, seeking review of the Commissioner's decision. [Doc. 3]. The answer and transcript were filed on March 21, 2018. [Docs. 8-9]. On May 23, 2018, Plaintiff filed a brief in support of her claim that the Commissioner committed reversible error, [Doc. 14], and on June 22, 2018, the Commissioner filed a response in support of the decision, [Doc. 15], to which Plaintiff replied, [Doc. 16]. The matter is now before the Court upon the administrative record, and the parties' pleadings and briefs,[3] and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[3] Neither party requested oral argument. (*See* Dkt.).

AO 72A
(Rev.8/8
2)

## II.    *PLAINTIFF'S CONTENTIONS*

Plaintiff claims that the ALJ erred by finding, without the advice of a medical expert, that Plaintiff was disabled as of December 11, 2015, but not before that date. [Doc. 14 at 1].

## III.    *STATEMENT OF FACTS*

### A.    **Background**

Plaintiff was born in January 1958 and was 56 years old on the alleged onset date of January 31, 2014.  [R260].  Plaintiff completed high school and worked in the past in sales, but discontinued work on December 31, 2009 due to "lack of work."  [R300-01]. She completed a year of college and has a certificate in interior design.  [R38-39].  She

AO 72A
(Rev.8/8
2)

initially alleged disability due to ascites,[4] cirrhosis,[5] thrombocytopenia,[6] anemia, hypothyroidism,[7] acute kidney injury, jaundice, and Graves' disease.[8] [R299].

---

[4]     Ascites is the accumulation of protein-containing (aascitic) fluid within the abdomen and can be caused by a number of disorders, most commonly high blood pressure bringing blood to the liver (portal hypertension) as a result of cirrhosis. *Merck Manual Consumer Version*, Steven K. Herrine, available at https://www.merckmanuals.com/home/liver-and-gallbladder-disorders/manifestations-of-liver-disease/ascites (last visited 3/28/19).

[5]     Cirrhosis is the widespread distortion of the liver's internal structure that occurs when a large amount of normal liver tissue is permanently replaced with nonfunctioning scar tissue.  The scar tissue develops when the liver is damaged repeatedly or continuously, which mostly commonly occurs as a result of chronic alcohol abuse, viral hepatitis, and fatty liver. *Merck Manual Consumer Version*, Jesse M. Civan, available at https://www.merckmanuals.com/home/liver-and-gallbladder-disorders/fibrosis-and-cirrhosis-of-the-liver/cirrhosis-of-the-liver (last visited 3/28/19).

[6]     Thrombocytopenia is a deficiency of platelets (thrombocytes), which increases the risk of bleeding and occurs when the bone marrow makes too few platelets or when too many platelets are destroyed or accumulate within an enlarged spleen, and can result in bleeding in the skin or bruising.  *Merck Manual Consumer Version*, David J. Kuter, available at https://www.merckmanuals.com/home/blood-disorders/platelet-disorders/overview-of-thrombocytopenia?query=thrombocytopenia (last visited 3/28/19).

[7]     Hypothyroidism is underactivity of the thyroid gland that leads to inadequate production of thyroid hormones and a slowing of vital body functions. *Merck Manual Consumer Version*, Jerome M. Hershman, available at https://www.merckmanuals.com/home/hormonal-and-metabolic-disorders/thyroid-gland-disorders/hypothyroidism?query=hypothyroidism (last visited 3/28/19).

[8]     Graves' disease is an autoimmune disorder that causes hyperthyroidism, or overactive thyroid.  With this disease, the immune system attacks the thyroid and

5

**B.    Lay Testimony**

At the hearing before the ALJ, Plaintiff testified that she lives alone in a two-story, single-family home, but lives downstairs, sleeps on the sofa, and only goes upstairs to shower.  [R41].  She has a driver's license and can drive. [R42].  Plaintiff testified that she spends most days watching television from the sofa.  [R76].  She can do laundry, but cannot vacuum due to her hand.  [R77].  She testified that she has trouble going to the mailbox and fell badly in May 2016 trying to get groceries out of the car, but did not seek medical attention.  [R77].

Plaintiff stated that, since her alleged onset date, she briefly worked answering phones at an office (as a temporary replacement while her friend was on medical leave) from 10 a.m. until four or five p.m., earning just over $3,000 in three months.  [R42]. She related that the work was very hard, but they understood her limits, it was not a busy office, and she could get up and sit down as needed.  [R78].  However, she did not think that she could continue doing that work, even under those conditions, because she

---

causes it to make more thyroid hormone than your body needs.  Nat'l Inst. of Diabetes and Digestive and Kidney Diseases, *Graves' Disease*, https://www.niddk.nih.gov/health-information/endocrine-diseases/graves-disease (last visited 3/28/19).

is now in more pain with her knees and has a harder time getting up and down. [R78-79].

Plaintiff testified that she "had major depression for a long time" and if affects her "job performance and anything I do." [R50]. She stated that she does not "want to go out of the house." [*Id.*]. She testified that she takes prescription antidepressants, which make her very tired and fall asleep. [R51].

Plaintiff also testified that she has cirrhosis of the liver as a result of drinking everyday, but that she has not drank since January 2014. [R52]. She reported that she went to Alcoholics Anonymous for eight weeks and has had some wine since then. [R53]. Most recently, she was told that her liver is functioning at 87 percent. [*Id.*]. She takes medication for her liver, which she claims prevents her from working because it causes her to fall asleep. [*Id.*]. She also testified that she has hypothydroidism which makes her hands shake such that she always drops things. [R54-55]. Plaintiff reported that her distance vision is blurry with her glasses and she has not been able to go to an eye doctor as she lacks health insurance. [R56-7, 41]. However, she can read with her current glasses. [R59].

Plaintiff testified that she no longer has strength in her right hand and cannot pull anything or hold anything heavy. [R59]. Plaintiff testified that she had Cortisone

7

shots[9] in her shoulder, which still hurts, because she could not move it at all. [R68]. She further explained that her foot and ankle surgery caused her equilibrium to be off, her toes do not bend, her knees "are giving out[,]" and it is very difficult to even go up the two stairs to get into her home or get out of the sofa. [R59-60]. Plaintiff admitted that the walker she brought to the hearing was not prescribed and she got it at a garage sale. [R60]. Plaintiff testified that Robin Carey, a D.O. at Grady, recommended a walker. [R68-69]. She also stated that, in 2015, another doctor at Grady told her the only treatment for her foot would be another operation. [R69-70].

Plaintiff recounted that she had "brain surgery" in 2014 due to an aneurysm.[10] [R71]. She later clarified that the vessel did not explode, as it was caught and repaired in time, but she was bleeding two weeks afterwards from the operation. [R72]. She

---

[9] Cortisone shots are injections that may help relieve pain and inflammation in a specific area of your body. They're most commonly injected into joints — such as your ankle, elbow, hip, knee, shoulder, spine and wrist. *See* Mayo Clinic, *Cortisone shots*, https://www.mayoclinic.org/tests-procedures/cortisone-shots/about/pac-20384794 (last visited 3/28/19).

[10] An aneurysm is a bulge or "ballooning" in the wall of an artery. Arteries are blood vessels that carry oxygen-rich blood from the heart to other parts of the body. If an aneurysm grows large, it can burst and cause dangerous bleeding or even death. MedlinePlus, https://medlineplus.gov/aneurysms.html (last visited 3/28/19).

8

reported that she returned to the emergency room and had low blood pressure and hemoglobin and received a blood transfusion, but has since been okay. [R73].

Plaintiff testified that, after her foot surgery, she planned to return to work, but her foot never got better. [R75]. She further testified that she cannot stay seated long and must get up every 20-30 minutes because she gets stiff. [R75]. She opined that she cannot lift more than five pounds with her right arm and 10 with her left. [R75-76]. She could stand for about 10 minutes before needing to sit, and can walk for 10 minutes. [R76].

### C.     Medical Records

#### 1.     *Physical Impairments*

On July 15, 2012, Plaintiff was seen at Gwinnett Medical Center with chest pain and was diagnosed with left chest wall pain and a right foot injury due to a motor vehicle accident the previous month. [R1841]. Chastain Resurgens Orthopaedics saw her on September 13, 2012, and she was diagnosed as suffering from a possible non-union of her TMT joints[11] in her foot. [R383]. She also had some chronic heel

---

[11]     The tarsometatarsal ("TMT"), or Lisfranc, joint or complex is a complex region of bone, ligaments, cartilage and other tissues on the foot where the long bones heading to the toes (phalanges) meet the bones of the middle foot and rear foot that make up the foot's arch (which includes the medial, intermediate, and lateral cuneiform, or cuboid, bones). The TMT joint provides stability when walking. *See*

9

valgus problems[12] and a tight calf with pain primarily in the midfoot and a collapsed flatfoot with a TMT fracture. [*Id.*]. She was prescribed a scooter and crutches. [*Id.*]. Plaintiff returned on October 4, 2012 for her TMT fracture dislocation, midfoot degenerative joint disease, hindfoot valgus and midfoot collapse, and she was determined to be ready for reconstructive surgery. [R382].

On October 12, 2012, Plaintiff was admitted to North Fulton Hospital and diagnosed with was a collapsed right foot with tight calf and TMT degenerative joint disease. [R355]. The secondary diagnosis was depression, asthma, hypertension, thyroid disorder, Graves' disease, prior surgery to the left ankle, and prior surgery to the right shoulder. [*Id.*]. Her discharge instructions were touchdown weightbearing plus elevation and use of a walker. [*Id.*]. The operative report indicated a right posterior tibial tendon[13] with talonavicular capsule/spring ligament reefing,[14] right foot

---

https://www.verywellhealth.com/tarsometatarsal-joints-1337736 (last visited 3/28/19).

[12]    Valgus refers to a bone deformity causing a bone to tilt away from the midline of the body. In the case of heel valgus, it causes the heel to drift outwards and can result in a flattening of the foot's arch. It can be genetic or due to an injury or r h e u m a t o i d    a r t h r i t i s . *S e e* https://www.versusarthritis.org/about-arthritis/conditions/valgus-heel/ (last visited 3/28/19).

[13]    The posterior tibial tendon attaches the calf muscle to the bones on the inside of the foot and holds up the arch and support the foot when walking. *See*

AO 72A
(Rev.8/8
2)

medial column flexor digitorum longus transfer,[15] right first, second, and third TMT joint fusion, and a right gastrocnemius recession.[16]  [R360].

Plaintiff returned to Chastain Resurgens Orthopaedics on October 24, 2012 for extensive foot realignment and fusion of first, second, and third TMT joint.  [R381]. She was stable, had steri-strips installed, and received a short leg cast with arch and toe

---

https://orthoinfo.aaos.org/en/diseases--conditions/posterior-tibial-tendon-dysfunction/(last visited 3/28/19).

[14]    Capsular reefing of the talonavicular joint is a method of tendon reconstruction surgery used to correct the forefoot-to-rearfoot relationship in posterior tibial tendon dsyfunction ("PTTD").  *See* Fleischli JG, Fleischli JW, Laughlin TJ, *Treatment of posterior tibial tendon dysfunction with tendon procedures from the posterior muscle group*, *Clin Podiatr Med Surg.*, 1999 Jul; 16(3):453-70, available at https://www.ncbi.nlm.nih.gov/pubmed/10470508 (last visited 3/28/19).

[15]    Stage II posterior tibial tendon dysfunction (PTTD) can be treated by flexor digitorum longus (FDL) tendon transfer.  *See* Reinhard Schuh, Florian Gruber, Axel Wanivenhaus, Nikolaus Hartig, Reinhard Windhager, and Hans-Joerg Trnka, *Flexor digitorum longus transfer and medial displacement calcaneal osteotomy for the treatment of stage II posterior tibial tendon dysfunction: kinematic and functional results of fifty one feet*, *Int Orthop.*, 2013 Sep; 37(9): 1815–1820, Published online 2013 Aug 22. doi: 10.1007/s00264-013-2071-6, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3764285/ (last visited 3/28/19).

[16]    Gastrocnemius recession is an inpatient surgical procedure used to treat flatfoot, chronic Achilles tendonitis, and toe walking by lengthening the muscles and tendons in the back of the leg, allowing the heel to shift downward into a more natural position.  *See* https://www.resurgens.com/foot-ankle/procedures/gastrocnemius-recession-intramuscular-approach (last visited 3/28/19).

AO 72A
(Rev.8/8
2)

plate which was placed in neutral. [*Id.*]. Plaintiff followed-up on November 7, 2012 for her post foot alignment and fusion and was stable, cleaned, redressed, and recasted. [R380]. Plaintiff continued her treatment on November 26, 2012 for her TMT degenerative joint disease and was stable and recasted in a short leg cast with an arch and toe plate. [R379].

On December 26, 2012, Plaintiff was again assessed at Chastain Resurgens and determined to be stable, with her midfoot much more stable and pain-free. [R378]. Her foot was again recasted. [*Id.*]. She returned on January 16, 2013 and was assessed with continued/recurrent collapsed foot at the talonavicular joint, with heel valgus, mildly improved with prior surgery but not completely realigned. [R377]. On February 1, 2013, Plaintiff returned again and was assessed with a questionable union at the first, second, and third TMT joint fusion site and a continued collapsed foot with the uncovering of the talar head[17] in the heel valgus. [R375].

---

[17] The talus is the bone at the bottom of the ankle, between the heel, midfoot and leg. When the talar head is uncovered it means that the top of the talus has been pushed out of alignment, creating a gap between the foot, heel, and leg bones or, essentially, a dislocated ankle. This is known as a Type II fracture on the Hawkins scale classifying tallus fractures. *See* Timothy Alton, MD, Daniel J. Patton, MD, and Albert O. Gee, MD, *Classifications in Brief: The Hawkins Classification for Talus Fractures*, *Clin Orthop Relat Res.*, 2015 Sep; 473(9): 3046–3049, published online 2015 Jan 14. doi: 10.1007/s11999-015-4136-x, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4523513/ (last visited 3/28/19).

AO 72A
(Rev.8/8
2)

On February 7, 2013, Plaintiff was admitted to North Fulton Hospital for a CT scan of her foot that determined that the previous fracture was in anatomic alignment and was fully united. The joint space was markedly reduced with near complete fusion of the three joints. [R351]. Plaintiff returned to Chastain Resurgens on February 14, 2013 for "severe flatfoot." [R374]. Although the treating doctor thought she would probably be best served by a triple arthrodesis,[18] he wanted to review her CT scan. [*Id.*].

Chastain Resurgens Orthopaedics saw Plaintiff on February 21, 2013 and assessed her with possible non-union of the first, second, and third TMT joints heel valgus and uncovered talar head. [R373]. Appropriate footwear was discussed and orthotics were glued to her shoe liners. [*Id.*]. Plaintiff returned on August 23, 2013[19]

---

[18] The triple arthrodesis is a foot surgery first developed in the early 20th century to stabilize the hindfoot of polio patients, but subsequently became a surgery to treat various musculoskeletal problems in the foot. It carries a risk of arthritis at the joints near the surgery site and increases joint pressure there. John Grady, Mallory Schweitzer, Keith D. Cook, and Zachary Criswell, *Point-Counterpoint: Is It Time To Retire The Triple Arthrodesis?, PodiatryToday*, Volume 29 - Issue 4 - April 2016, pp. 48-53 (Mar. 23, 2016), available at https://www.podiatrytoday.com/point-counterpoint-it-time-retire-triple-arthrodesis (last visited 3/28/19).

[19] Although the record indicates this note was made on August 23, 2012, the Court believes this is a scrivener's error, as it references a motor vehicle accident on August 26, 2012, which could not have occurred prior to August 23, 2012. [R385].

AO 72A
(Rev.8/8
2)

and reported a head-on motor vehicle accident on August 26, 2012. [R385]. She was assessed with an acute-on-chronic wear, instability, and the valgus of TMT joints in the middle of the right foot. [*Id.*]. She was advised to use a boot, rest, elevate, take Tramadol,[20] and partial weight bearing with the use of crutches. [R386].

Plaintiff was seen at Grady Hospital on January 26, 2014 for her cirrhotic liver with ascites. She was assessed with cirrhotic liver with ascites, no focal liver lesion, cholelithiasis[21] without evidence of cholecystitis,[22] and a nonobstructing right renal stone. [R1135-36, 1146].

On February 21, 2014, Plaintiff was admitted to Grady Hospital with abdominal pain, swelling, and dyspnea. [R428]. She was diagnosed with ascites, liver failure,

---

[20]     Ultram (tramadol) is in a class of medications called opiate (narcotic) analgesics and is used to relieve moderate to moderately severe pain. MedlinePlus, Tramadol, http://medlineplus.gov/druginfo/meds/a695011.html (last visited 3/28/19).

[21]     Cholelithiasis is the presence of one or more calculi (gallstones) in the gallbladder. Gallstones tend to be asymptomatic. Siddiqui, Ali A., M.D., Cholelithiasis, *available at* Merck Manual Professional Version, https://www.merckmanuals.com/professional/hepatic-and-biliary-disorders/gallbladder-and-bile-duct-disorders/cholelithiasis (last visited 3/29/19).

[22]     Cholecystitis is inflammation of the gallbladder. Mayo Clinic, *Cholecystitis*, https://www.mayoclinic.org/diseases-conditions/cholecystitis/symptoms-causes/syc-20364867 (last visited 3/29/19).

14

Graves s/p ablation which was now hypothyroid, bloating and shortness of breath at rest and it was noted that she had previously been admitted on January 20, 2014, diagnosed with cirhossis and received a interventional radiology ("IR") guided paracentesis.[23] [R428-29]. Another guided paracentesis was performed and revealed some ascites. [R446]. She was discharged on February 28, 2014. [*Id.*].

She returned on March 26, 2014 complaining of headaches that radiated around her head with some frontal eye pain and feelings of deteriorated vision that caused her to feel clumsy and an internal carotid artery ("ICA")[24] aneurysm was found on CT scan. [R553-54]. Plaintiff was diagnosed with an active problem list of jaundice, ascites,

---

[23]    Paracentesis is a procedure in which a thin needle or tube is put into the abdomen to remove fluid from the peritoneal cavity (the space within the abdomen that contains the intestines, the stomach, and the liver). National Cancer Institute, p a r a c e n t e s i s , https://www.cancer.gov/publications/dictionaries/cancer-terms/def/paracentesis (last visited 3/29/19).

[24]    The neck has two carotid arteries, which are further divided into an interior and an exterior artery, that transfer blood in and out of the skull, with the interior artery supplying blood to the brain and situated behind the ear. *See* https://www.healthline.com/human-body-maps/internal-carotid-artery#1 (last visited 3/28/19).

AO 72A
(Rev.8/8
2)

Graves' disease, end-stage liver disease, abdominal pain, esophageal varices in cirrhosis,[25] hypothyroid, and an ICA aneurysm.  [R555].

Plaintiff was admitted to Grady hospital on April 24, 2014 with complaints of generalized weakness, pain in her chest, shortness of breath, bilateral arm pain, and stated that she was "holding fluid."  [R565].  Pitting edema[26] was noted bilaterally in her legs and she was placed on continuous cardiac monitor.  [*Id.*].  Hypotension, shortness of breath, and liver disease were noted and she was discharged on April 26, 2014 and diagnosed with ascites, upper extremity and chest pain, as well as borderline hypotension.  [R565-70].

Grady Hospital saw Plaintiff on May 7, 2014 for a diagnostic cerebral angiogram,[27] following an aneurysm and neurosurgery evaluation.  [R1261].  She was

---

[25]     Esophageal varices are enlarged or swollen veins that occur on the lining of the esophagus and can be life-threatening if they break open and bleed.  *See* https://my.clevelandclinic.org/health/diseases/15429-esophageal-varices (last visited 3/28/19).

[26]     Pitting edema occurs when fluid collects in the tissue.  By pressing a thumb or finger firmly against the tissue for a few seconds, a dent can be produced. When the finger is withdrawn, the dent may persist for several minutes. MedlinePlus, *Pitting Edema on the Leg*, http://www.nlm.nih.gov/medlineplus/ency/imagepages/2916.htm (last visited 3/28/19).

[27]     A diagnostic cerebral angiogram, or arteriogram, is a procedure whereby a catheter is inserted into the femoral artery and threaded into the brain where it injects

AO 72A
(Rev.8/8
2)

discharged the next day as it went well without complications. [*Id.*].  She returned on May 13, 2014 complaining of a headache.  [R1302].

Plaintiff returned to Grady on May 16, 2014 to have the results of her foot surgery reevaluated since she had not gotten the results that she would have liked. [R1436].  An x-ray of her right foot and cervical spine on May 19, 2014 revealed that her right foot had screws from her previous surgery that suggest mobility at one area and that she had mild osteoarthritis of the cervical spine.  [R1462].

On May 28, 2014, Plaintiff was admitted to Grady Hospital for her aneurysm and required further hospitalization due to oozing from her groin.  [R701].  She received a blood transfusion on May 30, 2014 due to her blood loss.  [R711].  On that same date, she complained of a left shoulder pain and x-rays were taken that showed inferior

---

a contact agent to illuminate the vessels and produce images which allow for a more definitive diagnosis of changes to blood vessels. *See* https://www.wakemed.org/surgery-diagnostic-cerebral-angiography-what-to-expect (last visited 3/28/19).

AO 72A
(Rev.8/8
2)

humeral head[28] osteophytes,[29] but no dislocation, no significant AC joint[30] osteoarthritis, and no soft tissue abnormality. [R726]. She was discharged on June 1, 2014 but returned on June 5, 2014 due to her oozing groin hematoma. [R852]. Pressure dressing was placed on her left groin wound and Tramadol was given without success and then switched to Percocet[31] with good results. [*Id.*].

---

[28]    The glenohumeral joint is a ball-and-socket joint that helps move the shoulder forward and backward and allows the arm to rotate in a circular fashion or hinge out, up, and away from the body. Nat'l Inst. of Arthritis & Musculoskeletal & Skin Diseases, *Shoulder Problems*, http://www.niams.nih.gov/Health_Info/Shoulder_Problems/default.asp (last visited 3/29/19).

[29]    Osteophytes are common features of osteoarthritis and can contribute both to the functional properties of affected joints and to clinical relevant symptoms. Osteophyte formation is highly associated with cartilage damage but osteophytes can develop without explicit cartilage damage. Peter M. Van der KraanPh.D., and Wim B. Van den Berg, Ph.D., *Osteophytes: relevance and biology*, Osteoarthritis and Cartilage, Vol. 15, Is. 3 (Mar.2007), available at https://www.sciencedirect.com/science/article/pii/S106345840600327X (last visited 3/29/19).

[30]    The acromioclavicular ("AC") joint is a joint at top of shoulder where the clavicle and highest part of scapula meet. Grant Cooper, M.D., *Osteoarthritis Diagnosis*, Aug. 19, 2010, https://www.arthritis-health.com/types/osteoarthritis/what-acromioclavicular-arthritis-ac-joint-arthritis.

[31]    Percocet is a combination of oxycodone and acetaminophen and is a narcotic analgesic used to relieve moderate-to-severe pain. MedlinePlus, Oxycodone, https://medlineplus.gov/druginfo/meds/a682132.html (last visited 3/28/19).

18

AO 72A
(Rev.8/8
2)

On July 30, 2014, Grady noted an area of oozing that indicated a history of a gastric ulcer, [R1324], and a variceal screening[32] was conducted with an upper endoscopy, [R1731]. However, a year later, on July 29, 2015, Plaintiff was seen at Gwinnett Medical Center for vomiting blood and diagnosed for upper GI and variceal bleed, alcoholic cirrhosis, thrombocytopenic, anemia of acute blood loss, and mildly elevated levels of urea nitrogen and serum creatine in her blood. [R1774-75].

On September 9, 2015, Plaintiff was seen at Grady for her thyroid problem and given medication, [R1848], with a follow-up on September 13, 2015, [R1852]. On March 8, 2016, Plaintiff was seen at Grady to follow-up on her Graves' disease ophthalmic complication, hyperthyroidism, history of alcohol dependence, cirrhosis with decline in brain function, varices, ascites, and painful tongue ulcer. [R1857-59]. Plaintiff returned on March 21, 2016, for abduction deformity of her foot, a mass on her left breast, acute bronchitis, and feeling tired. [R1872]. She also still had the tongue ulcer, was severely depressed, had chronic pain, including in her right arm intermittently and all over her body. [R1880]. She returned on April 13, 2016 with

---

[32]   Esophageal varices are dilated collateral blood vessels that often develop as a result of cirrhosis which increases liver vein pressure and deteriorates liver function.   If they grow up to a critical point, when they rupture and cause life-threatening bleeding.   They can be seen on endoscopy.   *See* https://bestpractice.bmj.com/topics/en-us/815 (last visited 3/28/19).

AO 72A
(Rev.8/8
2)

arm and toe pain after a mugging five days prior in which she was thrown to the ground and got large hematomas on her left elbow and arm and bruising on her foot and toes. [R1884].

### 2. Mental Impairments

On May 21, 2014, View Point Health saw Plaintiff for symptoms of depression, anxiety, tearfulness, and insomnia and was diagnosed with alcohol abuse, severe depression, cirrhosis of the liver, and social support problems. [R1225-26]. On June 9, 2014, Plaintiff returned with the same symptoms and received the same diagnosis. [R1236-37]. Plaintiff returned the next day and her symptoms and diagnosis were again the same. [R1229]. On March 8, 2015 Plaintiff went to Grady for routine care and referrals for mental health treatment due to depression. [R1856].

### 3. Medical Opinions

On June 16, 2014, Plaintiff presented for a consultative examination with Sarah E. Howell, Psy.D., who conducted a psychological evaluation via a clinical interview and concluded that Plaintiff met the criteria for Major Depressive Disorder, Recurrent, Moderate; Adjustment Disorder with Anxiety; and Alcohol Use Disorder, moderate, sustained partial remission, and was assessed with minimal or mild limitations in all four functional domains. [R1240-43].

20

### D. Vocational-Expert Testimony

The VE testified that Plaintiff's past work as an order clerk was semi-skilled and sedentary, as a recruiter was skilled and sedentary, as a trainer was skilled and light, as a software sales representative was medium/light and skilled, as a telecommunications sales representative was light skilled, and as a telephone operator was sedentary and semi-skilled. [R81-83].

The VE testified that a person of plaintiff's age, education, and work experience, who can perform light work, as described in the DOT, never climb ladders, ropes or scaffolds, but can occasionally climb ramps or stairs, stoop, kneel, crouch and crawl, and limited to simple, routine work, could not perform Plaintiff's past work. [R83]. The VE also testified that the same person without the simple, routine work limitation could not perform software sales representative jobs at the medium level, but could do the recruiting, filling orders, telephone operator, and the AT&T sales representative jobs. [R83-84]. The VE testified that a person of plaintiff's age, education, and work experience, who could sit for an hour, stand for 30 minutes, walk an hour total in a workday, and never lift ten or more pounds, could not perform any work. [R87].

## IV. ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 416.971 *et seq.* and 404.1571 *et seq.*).

. . .

3. Since the alleged onset date of disability, January 26, 2014, the claimant has had the following severe impairments: chronic liver disease/cirrhosis and osteoarthritis (20 CFR 404.1520(c) and 416.920(c)).

. . .

4. Since the alleged onset date of disability, January 26, 2014, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, I find that prior to December 11, 2015, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined by in 20 CFR 404.1567(b) and 416.967(b) except she could never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl.

. . .

6. After careful consideration of the entire record, I find that beginning December 11, 2015, the claimant has the residual

AO 72A (Rev.8/8 2)

functional capacity to perform a markedly reduced range of sedentary work as defined by 20 CFR 404.1567(a), in that she can never lift even up to 10 pounds, and she can only sit for one hour total, stand for 30 minutes total, and walk for one hour total in an eight-hour day.

. . .

7.    Prior to December 11, 2015, the claimant was capable of performing past relevant work as an order clerk, personnel recruiter and trainer, sales representative, and telephone operator.  The work does not require the performance of work-related activities precluded by claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

. . .

8.    Beginning on December 11, 2015 the claimant's residual functional capacity has prevented the claimant from being able to perform past relevant work  (20 CFR 404.1565 and 416.965).

9.    The claimant was an individual of advanced age on December 11, 2015, the established disability onset date (20 CFR 404.1563 and 416.963).

10.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

11.    The claimant does not have work skills that are transferable to other occupations within the residual functional capacity defined above  (20 CFR 404.1568 and 416.968).

12.    Since December 11, 2015, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the

23

national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

. . .

13. The claimant was not disabled prior to December 11, 2015 (20 CFR 404.1520(f) and 416.920(f) but became disabled on that date and has continued to be disabled through the date of this decision  (20 CFR 404.1520(g) and 416.920(g)).

[R18-26].

The ALJ examined Plaintiff's claims of depression, anxiety and substance abuse, but concluded that they were not severe because both examining and consultative medical sources assessed her with no more than minimal limitations in her ability to function, and this conclusion was supported by treatment notes in the record.  [R19-20]. Likewise the ALJ recognized that Plaintiff had the following impairments: hypothyroidism, Graves' disease; thrombocytopenia; anemia; acute kidney injury; and was obese.  [R20-21].  However, the ALJ found that none of the impairments, either singly or in combination, caused more than minimal limitations.  [*Id.*].

In so concluding, the ALJ accorded significant weight to Dr. Howell's opinion that Plaintiff was no more than minimally or mildly limited due to her mental health, because it was supported by her own examination and the overall evidence. [R19].  The

AO 72A
(Rev.8/8
2)

ALJ also accorded significant weight to non-examining psychological consultants as they were consistent with the record. [R20].

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of these symptoms are not supported prior to December 11, 2015. [R22]. First, the ALJ noted that Plaintiff admitted she ceased work in December 2009, not due to disability, but due to a lack of work. [R22]. Second, the ALJ noted that, in early 2014, there were no treating sources indicating any functional limitations due to an impairment and, while Plaintiff was hospitalized in July 2015 for an acute upper GI bleed, she was able to work seven hours a day for five days a week for three months in early 2015. [R23-24].

However, the ALJ acknowledged that Plaintiff's condition worsened in late 2015, as she was seen at Grady in March 2016 for depression and chronic pain. [R24]. He noted Dr. John Shih's May 11, 2016 medical source statement opining that Plaintiff could not lift more than 10 pounds, sit for more than one hour, stand for more than 30 minutes, or walk for more than an hour in an eight-hour workday. [R25]. The ALJ also noted that there were internal inconsistencies between Dr. Shih's exam—documenting Plaintiff's antalgic gait but no atrophy, joint tenderness, full strength in all

25

extremities—and opinion. [*Id.*]. Nevertheless, the ALJ accorded significant weight to Dr. Shih's opinion as it was "sufficiently supported by his examination and testing." [*Id.*].

The ALJ concluded that Plaintiff "became disabled at or near December 11, 2015 (six months prior to the consultative examination of Dr. Shih, which provides sufficient evidence of disability)." [*Id.*]. Consequently, the ALJ found that, based on the VE's testimony, Plaintiff could perform past relevant work prior to December 11, 2015. [*Id.*].

## V.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in

26

any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant

AO 72A
(Rev.8/8
2)

is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

AO 72A
(Rev.8/8
2)

## VI.  SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VII.   CLAIMS OF ERROR

Plaintiff claims that the ALJ improperly found, without any medical expert advice, that Plaintiff was not disabled prior to December 11, 2015. [Doc. 14 at 1].

### A.   Standards for Determining Alleged Onset Date

Social Security Ruling 83-20 governs the method for determining a claimant's alleged onset date and defines the alleged onset date as "the first day an individual is

AO 72A
(Rev.8/8
2)

disabled as defined in the Act and the regulations[.]" SSR 83-20, 1983 WL 31249.

When the onset of a claimant's disabilities is progressive (rather than of a traumatic

origin), the determination of onset involves consideration of the claimant's allegations,

work history, if any, and the medical and other evidence concerning impairment

severity. *Id.* at *2; *accord Alexander v. Comm'r of Soc. Sec.*, 435 Fed. Appx. 813, 817

(11th Cir. July 20, 2011); *Volley v. Astrue*, Civ. Action No. 1:07-CV-0138-AJB,

2008 WL 822192, at *12 (N.D. Ga. Mar. 24, 2008) ("[T]he ALJ should consider the

applicant's allegations, work history and 'medical and other evidence.' ") (quoting

SSR 83-20). "The weight to be given any of the relevant evidence depends on the

individual case." SSR 83-20. However, there is no rigid requirement that the

Commissioner specifically refer to every piece of evidence in the decision, so long as

the decision is not a broad rejection which is not enough to enable the court to conclude

that the Commissioner considered the claimant's medical condition as a whole.

*Moncrief v. Astrue*, 300 Fed. Appx. 879, 881 (11th Cir. Dec. 1, 2008) (citing *Dyer*,

395 F.3d at 1211) (affirming ALJ's decision despite plaintiff's contention that the ALJ

had ignored evidence favorable to her); *see also McLain v. Comm'r, Soc. Sec. Admin.*,

676 Fed. Appx. 935, 937 (11th Cir. Jan. 20, 2017) (citing *Mitchell v. Comm'r, Soc. Sec.*

*Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (same)).

31

SSR 83-20 recognizes that when impairments are slowly progressive, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling," and that "[d]etermining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available." SSR 83-20, 1983 WL 31249 at *2. In these cases, the onset date must be inferred from the evidence that "describe[s] the history and symptomatology of the disease process." *Id.* When determining the onset date, "the date alleged by the individual should be used if it is consistent with all the evidence available," and "[w]hen the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy." *Id.* at *3. In any case, "the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." *Id.*

In such cases, where precise evidence is not available and an inference must be made as to the date of onset of disability, SSR 83-20 additionally provides that the ALJ should take testimony from a medical expert:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be

32

> determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

*Id.* SSR 83-20 also makes clear that where medical evidence pertaining to the relevant time period is no longer available, the medical expert—as well as the ALJ—should consider other sources of documentation, such as medical evidence pertaining to the claimant's condition outside the relevant period, as well as lay evidence.  *Id.* at *3-4 (providing an example where a reviewing physician requested to comment on the severity of the claimant's impairment as of the alleged onset date rendered his opinion based on the current severity of the claimant's condition "together with the other evidence relating to the impairment").

As one court in the Eleventh Circuit has noted,

> The Eleventh Circuit has not addressed SSR 83-20 in a published decision.  In an unpublished decision, the Eleventh Circuit has stated SSR 83-20 is applicable only where the ALJ has made a finding of disability "and it is then necessary to determine when the disability began."  *Caces v. Comm'r, Soc. Sec. Admin.*, [560 Fed. Appx. 936, 939 (11th Cir. Mar. 27, 2014)] (citation omitted); *cf. Rojas v. Comm'r of Soc. Sec.,* No. 2:11-cv-124-FtM-MRM, 2017 WL 2130078, at *10-11 (M.D. Fla. May 17, 2017) (applying SSR 83-20 where ALJ made no finding of disability, but there was "strong evidence that [the plaintiff] became disabled at some time").

33

> "[C]ourts have generally interpreted SSR 83-20 to require that an ALJ obtain the opinion of a medical expert when the medical evidence is either inadequate or ambiguous as to the specific date of onset." *Powell v. Astrue*, No. 7:11-CV-105 (HL), 2013 WL 752961, at *4 (M.D. Ga. Jan. 29, 2013) (quoting *Nixon v. Astrue*, No. 1:11-CV-2032-JSA, 2012 WL 5507310, at *4 (N.D. Ga. Nov. 14, 2012) ); *see also Volley v. Astrue*, No. 1:07-CV-0138-AJB, 2008 WL 822192, at *12 (N.D. Ga. Mar. 24, 2008); *McManus v. Barnhart*, No. 5:04-CV-67-OO-GRJ, 2004 WL 3316303, at *6 (M.D. Fla. Dec. 14, 2004) ("[T]he most logical interpretation of SSR 83-20 is to apply it to situations where the ALJ is called upon to make a retroactive inference regarding disability involving a slowly progressive impairment, and the medical evidence during the insured period is inadequate or ambiguous").

*Martinez v. Comm'r of Soc. Sec.*, Case No. 2:17-cv-152-FtM-CM, 2018 WL 4328217 at *4 (M.D. Fla. Sept. 11, 2018). An ALJ is required to obtain the assistance of a medical advisor to determine the onset date of disability under SSR 83-20 "if: (1) the claimant suffers from a slowly progressing impairment(s) of nontraumatic origin; (2) there is strong evidence the claimant became disabled at some time; and (3) the evidence during the relevant period is inadequate or ambiguous." *Id.* at *6 (citing *Rojas v. Comm'r of Soc. Sec.*, Case No. 2:11-cv-124-FtM-MRM, 2017 WL 2130078, at *10 (M.D. Fla. May 17, 2017)).

## B.    Parties' Arguments

Plaintiff claims that the ALJ erred by assessing her alleged onset date because, since she suffered from slowing progressive impairment, the ALJ needed to consult

34

with a medical expert to determine her onset date, since the ALJ does not have the medical expertise to make a determination of when a disability begins or ends. [Doc. 14 at 11]. Since no traumatic event occurred that would allow for the December 11, 2015 alleged onset date, Plaintiff submits that the ALJ not have opined on the alleged onset date but should have had a medical expert at the hearing. [*Id.* at 15-17].

The Commissioner responds that the ALJ complied with SSR 83-20, which does not require that he obtain a medical expert regarding Plaintiff's disability onset date. [Doc. 15 at 5 (citing SSR 83-20, 1983 WL 31249, at *1)]. First, the Commissioner argues that because SSR 83-20 states that an ALJ "should" call upon a medical expert and HALLEX I-2-5-34(2) leaves it to the ALJ's discretion, there is no requirement that an ALJ seek a medical expert's advice regarding alleged onset date. [*Id.* at 6-7 (citing 1983 WL 31249 at *3; HALLEX I-2-5-34, 1994 WL 637370 [("An ALJ may need to obtain an ME opinion, either in testimony at a hearing or in responses to written interrogatories, when the ALJ . . . [n]eeds an expert medical opinion regarding the onset of an impairment.")]; *Marceau v. Berryhill*, No. 2:16-cv-0547-LSC, 2017 WL 3969729, at *6 (N.D. Ala. Sept. 8, 2017); *Bailey v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995))]. The Commissioner argues that, when the medical evidence is adequate and unambiguous,

AO 72A
(Rev.8/8
2)

as here, no medical expert is required. [*Id.* at 7 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1201 (8th Cir. 1997); *Wellington v. Berryhill*, 878 F.3d 867, 874 (9th Cir. 2017); *Moncrief v. Astrue*, 300 Fed. Appx. at 882; *O'Neal v. Comm'r of Soc. Sec.*, No. 8:16-cv-495-T-JSS, 2017 WL 875789, at *6 (M.D. Fla. Mar. 6, 2017))].

Second, the Commissioner argues that, although Plaintiff cites the record to show support for her alleged onset date, the ALJ considered this record and provided good reasons for not fully crediting Plaintiff's alleged limitations. [Doc. 15 at 12]. Lastly, the Commissioner argues that the fact that Plaintiff cites to an extensive records underscores how much medical evidence was before the ALJ from which to determine an alleged onset date, thereby obviating the need for a medical expert. [*Id.* at 11-12 (citing *Caballero v. Comm'r of Soc. Sec.*, No: 6:16-cv-1056-Orl-GJK, 2017 WL 1929708, at *4 (M.D. Fla. May 10, 2017); *Goldsby v. Astrue*, No. 2:11-CV-03411-RDP, 2013 WL 1176179, at *5 (N.D. Ala. Mar. 18, 2013); *Moncrief*, 300 Fed. Appx. at 882; *Grebenick*, 121 F.3d at 1201; *O'Neal*, 2017 WL 875789, at *6)].

Plaintiff replies that "nowhere in the defendant's brief does the defendant point to any medical evidence in the record that ties this date of December 11, 2015 to the

36

ALJ's decision to pick that as the onset date of disability." [Doc. 16 at 1]. Plaintiff

also replies that HALLEX is not law, but the SSR is.[33] [*Id.* at 2]

## C. Analysis

To be sure, the Commissioner's determination of an onset date is far from an

exact science. Be that as it may, the standard for the Court is not whether the evidence

in the record could support Plaintiff's interpretation of the facts or even the Court's

---

[33] Plaintiff is not exactly correct here as neither HALLEX nor the SSR are binding law for this Court. Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process. *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)). Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

The Eleventh Circuit has addressed HALLEX but has refrained from determining whether it is binding on the Commissioner. *See George v. Astrue*, 338 Fed. Appx. 803, 805 (11th Cir. July 8, 2009). Other circuits have held that HALLEX is either not binding on the Commissioner or that a violation of HALLEX is not reversible error absent a showing of prejudice. *See Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000); *Newton v. Apfel*, 209 F.3d 448, 459-60 (5th Cir. 2000).

AO 72A
(Rev.8/8
2)

interpretation, but instead, whether substantial evidence supports the *Commissioner's* findings. *Mitchell*, 771 F.3d at 782; *Dyer*, 395 F.3d at 1210; *see* 42 U.S.C. § 405(g). Here, it is possible that Plaintiff's limitations were a result of a slowly progressing impairment (cirrhosis) or caused or aggravated by traumatic events such as her 2012 automobile accident or 2016 mugging (osteoarthritis). However, the onset date inferred by the ALJ—which was before Plaintiff's mugging but after her car accidents—suggests he did not consider her impairments to result from these traumas. Consequently, it appears that the ALJ considered Plaintiff's impairments to be slowly progressing and, as Plaintiff has not asserted otherwise, the Court will assume they were slowly progressing.

The ALJ pointed out that Plaintiff was able to work for three months in early 2015, noting that that fact "does not tend to support the claim that she was disabled from working." [R24, n.1]. The ALJ also pointed to Plaintiff's treatment records in July 2015 and March 2016, in conjunction with Dr. Shih's May 2016 consultative examination, support the December 11, 2015 onset date. [R24-25]. However, there is no mention whatsoever of any medical records between July 2014 and March 2016 to support the December 11, 2015 onset date. [*Id.*].

AO 72A
(Rev.8/8
2)

While Dr. Shih certainly opined that Plaintiff was disabled when he filled out the form in May 2016 and checked a box that indicated that Plaintiff had or would have these limitations for twelve months, it is unclear if or when he determined that Plaintiff's impairments began. [R1902]. As a result, it is not clear that the onset date is supported by Dr. Shih's report. In fact, the ALJ noted "apparent inconsistencies" in Dr. Shih's report, and immediately thereafter stated that

> I have found the claimant's cirrhosis and osteoarthritis are severe, and the combination of her impairments led to my conclusion that the claimant became disabled at or near December 11, 2015 (six months prior to the consultative examination of Dr. Shih, which provides sufficient evidence of disability).

[R25]. The fault with the ALJ's decision is that he "does not specifically state how this particular onset date was chosen or why the impairments became disabling on [December 11, 2015]." *See Powell v. Astrue*, No. 7:11-CV-105 (HL), 2013 WL 752961, at *5 (M.D. Ga. Jan. 29, 2013), *adopted by* 2013 WL 750045, at *1 (M.D. Ga. Feb. 27, 2013). The Court has reviewed the evidence of record and can find " 'nothing contained [therein] indicating that [Plaintiff's] condition worsened on [that date].' " *John A. v. Comm'r, Soc. Sec. Admin.*, No. 3:17-CV-00141-RGV, 2019 WL 994970, at *14 (N.D. Ga. Feb. 19, 2019) (quoting *Mahon v. Comm'r of Soc. Sec.*, Case No. 8:16-cv-1462-T-JSS, 2017 WL 3381714, at *7 (M.D. Fla. Aug. 7,

2017)) (alterations in quoted text added). "Simply put, nothing happened on [December 11, 2015]," *Brothers. v. Astrue*, No. 06 C 7088, 2011 WL 2446323, at *10 (N.D. Ill. June 13, 2011), that points to that date as the onset date, and the Commissioner has not pointed to anything in the record to show otherwise. While the Commissioner points to evidence that might direct a not-disabled finding before December 11, 2015, [Doc. 15 at 9-10], the Commissioner's argument that "[s]ubstantial evidence further supports the ALJ's finding that Plaintiff's conditions worsened in late 2015, to the point that she could work no more than a markedly reduced range of sedentary work, [*id.* at 10 (citing [R24-25])], is not supported by the record, since the very next citation concerns Plaintiff's injuries sustained in the April 2016 mugging and post-April 2016 medical records. [*Id.* at 10-11]. As a result, the ALJ's determination that Plaintiff's onset date is December 11, 2015 is not supported by substantial evidence.[34]

---

[34] The Court does not venture an opinion whether this error is clearly harmless because neither party addressed it. The Court is not required to make arguments on behalf of a party to litigation, especially a represented party, and it is not inclined to do so in this case. *See Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1265 n.3 (10th Cir. 2008); *see also Aikens v. Ingram*, 652 F.3d 496, 506 (4th Cir. 2011) (" '[I]t is not the Court's place to try to make arguments for represented parties.' " (quoting *Vazquez v. Cent. States Joint Bd.*, 547 F. Supp. 2d 833, 861 (N.D. Ill. 2008))). The error may or not be harmless as Plaintiff applied for both DIB and SSI and her date last insured for purposes of DIB was December 31, 2015. [R18]. If the ALJ erred and

AO 72A
(Rev.8/8
2)

Accordingly, the Court **REVERSES** the Commissioner's decision and **REMANDS** this case to the Commissioner for further consideration of Plaintiff's claims consistent with this Order and Opinion.

## VIII. *CONCLUSION*

In conclusion, the Commissioner's decision is **REVERSED AND REMANDED** for further consideration of Plaintiff's application.

The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this the 29th day of March, 2019.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

---

Plaintiff's onset date is before December 11, 2015, or after December 31, 2015, it will alter the amount of benefits Plaintiff will receive. *See* SSR 83-20, 1983 WL 31249, at *1 ("A claimant's onset date can in many cases be 'critical' because 'it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits.' ").